# CONGER *v.* BALTIMORE & OHIO RAILROAD COMPANY.*

DIRECTION OF VERDICT; NEGLIGENCE; INFANTS; RAILROADS; NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE; CROSSINGS.

1. If the evidence raises any issue whatever,—whether from a conflict of evidence, or from a state of facts from which reasonable and fair-minded men might draw different conclusions,—as to the existence of either negligence or contributory negligence, the question is one of fact, and not of law, and should be submitted to the jury. (Following *Glaria* v. *Washington Southern R. Co.* 30 App. D. C. 559.)

2. Negligence of an adult cannot be imputed to a child in his care.

3. A boy of twelve years of age, on a wagon of his employer crossing the tracks of a railroad company at a point which the public has used as a crossing for years, is not a trespasser.

4. While a boy of twelve years of age is not of such tender years as to be incapable of being guilty of contributory negligence, he cannot be deemed to possess the same degree of discretion as a person of mature years.

5. *Semble,* In the absence of affirmative proof that a boy of twelve years of age had ever before crossed the railroad track at a crossing, or knew of the existence of an electric signal bell at the crossing, it may be presumed, from the fact that he had lived with his parents for nine years at a point 400 yards from the crossing, that he had frequently crossed the tracks at that point during that time, and knew of the existence of the bell.

---

*\*Negligence—Imputed.*—As to imputed negligence of driver to passenger, see note to *Schultz* v. *Old Colony Street R. Co.* 8 L.R.A.(N.S.) 597.

6. It is the duty of a railroad company to give timely notice of the approach of its trains at a crossing, and, where no particular means of giving such warning is prescribed by law, the company has the right of selection.

7. Where a railroad company has installed an electric bell at a crossing to give notice of the approach of trains, it is negligence on its part if, on a given occasion, the bell is out of order and does not ring, and it gives no other notice of the approach of trains that furnishes an equivalent protection; and it is immaterial, in the determination of the company's negligence, whether a person crossing the tracks on such occasion, and killed by a passing train, had ever crossed the tracks at such point before, or knew of the existence of the bell.

8. Whether the blowing of the whistle of the locomotive of a train traveling 60 miles an hour, 150 yards before it reached a crossing where there is a series of four parallel tracks, is a sufficient and timely warning to a person driving across the tracks at the crossing, of the approach of the train, is a question for the jury.

9. Where, in an action against a railroad company for damages for the death of a twelve-year-old boy, who, while crossing a railroad track at a regular crossing on a wagon driven by his employer, was killed by an approaching train, there is evidence that the train was going 60 miles an hour, that the employer stopped his horse and looked before attempting to cross, and that there was no train in sight; and there is a conflict of evidence as to the distance an approaching train could be seen, some persons placing the distance at ½ mile and others at less than ¼ of a mile,—the question of decedent's alleged contributory negligence is for the jury.

No. 1826. Submitted March 6, 1908. Decided March 31, 1908.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action by an administrator to recover damages for the death of his decedent by reason of the alleged negligence of the defendant.                                    *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an action on the case, brought by appellant, William H. Conger, administrator of the estate of George Conger, deceased, in the supreme court of the District of Columbia to re-

cover damages from the appellee, the Baltimore & Ohio Railroad Company, for the death of his intestate, George Conger.

It appears that, on the morning of June 25, 1906, the deceased, in company with one Welker, was crossing the tracks of the appellee on a highway crossing at Langdon, District of Columbia, when he was struck by the engine of a passing train belonging to appellee, and killed. On the morning in question Welker, who was a milk dealer, had engaged the services of the deceased to assist him in delivering milk. He used, for the purpose of delivering the milk, a single horse, attached to a covered wagon. At the time of the accident he was crossing the railroad tracks, and the deceased, a boy twelve years of age, was standing on the step at the rear end of the wagon. At the point where the road crossed the railroad there were four separate tracks, the outer tracks being sidings, and the two inside tracks constituting the main line of the road. Langdon is a station on the line of the Baltimore & Ohio Railroad between Washington and Baltimore. There was a conflict in the evidence as to exactly what happened at the time, or just before, the accident occurred. Trains coming from Baltimore would pass this point on the third track from the side toward which Welker was approaching. Welker testified that, as he approached the tracks, he stopped his horse and looked toward Baltimore and then toward Washington, and that he saw no train approaching. Seeing or hearing nothing, he started his horse on a walk across the tracks. When he had advanced to the second track, he discovered the approaching train but a short distance away, coming from the direction of Baltimore. He called to the boy to hold on, and struck his horse in an attempt to get out of the way. The train struck the rear end of the wagon, smashing the vehicle and killing the boy.

There is evidence to the effect that the train was running at the rate of 60 miles an hour. The evidence also discloses that, approaching the crossing in a westerly direction, (the direction Welker was going,) there is a clump of trees and a bank, which hide appellee's tracks and obstruct the view along the tracks, except for a short distance from the crossing. This obstruction

continues until one approaching on the highway gets almost to the tracks, when the tracks, looking toward Baltimore, become visible for a distance of about ¼ of a mile, where the road curves and emerges from a deep cut.

Appellee had placed an electric bell at the crossing, which was so arranged that an approaching train, at a point a mile distant from the crossing, would operate a trip or spring that would start the bell ringing, and it would continue to ring until the train had passed. Welker testified that, when he approached the tracks, the bell was not ringing. In this he was corroborated by other witnesses. He also testified that the train did not whistle when it approached the crossing. Other witnesses, who were present, testified that they did not hear it whistle. Appellee attempted to establish that, at the time Welker approached the tracks, the electric bell was ringing, and that the train whistled at a sufficient distance from the crossing to give decedent notice of its approach. One Timberlake, a witness for the appellee, testified as follows: "I am agent for the B. & O. at Langdon, District of Columbia. I was at the station on the morning of June 25, 1906, at the time of the accident. I am block operator and agent. I received a report of this train as approaching from Alexandria junction, from the operator at that point. That is about 4 miles away from Langdon. I then watch for the approach of the train and when the engineer blows for the target I then pulled up the target lever which gives him a red, white, or green, whichever it may be. I gave him the clear signal, the white signal. The target is right in front of my window, but the semaphore is, of course, above the roof. The crossing is about 200 or 250 feet from the target and towards Baltimore. The engineer blew a long blast for the target, and I gave him a clear signal, and, after giving him the clear signal, he answered me by two short toots of the whistle. When the engine blew for the target he was five or six telegraph poles away. These poles are 75 feet apart. When he answered the target, why I would think he was about,—oh, he was only about one pole-length away from the crossing. When he blows for the target it only takes me a matter of a very short while to pull my

lever, and as soon as he sees the paddle thrown down he answers. Those signals were given on this morning. I saw this wagon when it was within 50 feet of the crossing. It came trotting up to the track, and I naturally supposed that he would stop before he crossed over, but, instead of that, he did not make any halt whatever. He trotted right up to the east-bound track, and, as the horse's feet struck the east-bound track, it stopped trotting and went over walking; but in doing so he was crossing right in front of this train."

It will be observed that this witness fixes the distance of the train from the crossing, when the whistle blew first, at from 125 to 150 yards. On this point, he is corroborated by one Strider, the conductor in charge of the train, another witness for appellee, who testified as follows: "I was the conductor of the train that struck the wagon at Langdon on June 25, 1906. When we approached Langdon I was sitting in a dead-head parlor car which was coupled next to the engine. As we approached the crossing I heard the sound of a whistle in two different ways. He blowed for the road crossing, and he blowed for the target and answered it. As we passed the crossing, I saw this wagon lying on its side, and I jumped up and ran out to the rear end of the car and looked out. The engineer was then trying to stop. As soon as the train stopped I ran back, and found an officer and some men at the crossing. I found we had killed this little boy. When the signals were blown I supposed the train was 100 or 150 yards from the crossing; we had gotten around the curve and had just entered on the straight track in sight of the crossing. Don't know how far the curve is from the crossing."

When appellant rested his case, counsel for appellee moved the court to instruct the jury to return a verdict for the appellee. This motion was denied. Appellee then introduced its evidence, and, when the evidence was all submitted, it renewed its motion, which was allowed by the court, and the jury accordingly returned a verdict for appellee. The court, in sustaining the motion of appellee, made the following statement: "It seems to me that there is no doubt about the question of fact that there was nothing the matter with this crossing bell, that it was not out

of condition,—not out of repair,—and it rang on this occasion. I think that is as well established by the evidence as is the proposition that the whistle was blown, and that there cannot be any doubt about it; but, for the sake of the question, it may be conceded that there is a dispute upon the point of the ringing of the crossing bell which would entitle the plaintiff to go to the jury on that point, if the case turned on the finding as to that point. But I cannot bring my mind to believe that the case stands upon that proposition. So in what I have to say in ruling in that regard it may be assumed that the crossing bell did not ring. I cannot conceive that the railroad company would be liable to the administrator of the child unless they had violated some duty they owed the child; in other words, unless they had been guilty of negligence towards the child, as distinguished from negligence towards Welker. It might well be that a railroad company is negligent concerning one individual and not negligent concerning another. If a railroad company puts a bell on a crossing and says to Welker: 'Here, I will ring this bell every time you come across when a train is near,'—it might be negligence not to do that when Welker came along; but it would not be negligence for the railroad company not to ring that particular crossing bell when a stranger came along who never saw that crossing, who did not know anything about the bell, and who had no reason to expect the existence of the bell. That is the case, so far as it concerns this child. There is no evidence in the case to show that he ever knew anything about the crossing, or ever went by the crossing before. So, with respect to the child, the duty the railroad company owed with regard to that crossing was to notify this child of the approach of the train. If they did that, they performed the duty that was upon them in respect to him, and that they did by blowing the whistle of the engine. Nobody can doubt that that whistle was blown, if they impartially determine the question. I am not at all disturbed, as I said several times, about the question whether the child was guilty of contributory negligence. That is a peculiar kind of a question. It never resolves itself into a question of law. It is always a question for the jury to say whether or

not, under the circumstances of the case, the child exercised that degree of care and prudence that would and should be expected from a child of that age and intelligence and experience. So this ruling is based distinctly on the proposition that the child was not guilty of any contributory negligence, just as the ruling in the Barstow Case was. But, as I was saying, the ruling in the Barstow Case, to which counsel referred, tried in this court, was based entirely on the proposition that there was nothing in that case to show that the defendant was negligent there. That case went off upstairs on the proposition that was conceded down here, and that was that the child was not guilty of contributory negligence. So I want this record to show that it is taken for granted that this child was not guilty of contributory negligence, and that the ruling is based on the proposition that there is nothing which tends to show that the railroad company violated any duty it owed the child, or is guilty of any negligence respecting the child so that the administrator of the child has a right to recover against it. I cannot see any escape from that conclusion, gentlemen of the jury. You may return a verdict for the defendant."

From the judgment rendered, appellant prosecuted this appeal, with the following assignments of error:

1. That the trial court erred in refusing to allow appellant to show the dangerous character of the crossing in question.

2. That the trial court erred in refusing to allow appellant to show the happening of prior accidents at this public-road crossing.

3. That the trial court erred in refusing to allow appellant to show that actual notice was directly given appellee of the electric signaling bell being out of order immediately before the Conger accident.

4. That the trial court erred in refusing to allow appellant to show how generally defective and unreliable the electric signaling bell was as a means of warning a passer-by.

5. That the trial court erred in directing a verdict for the defendant upon all the evidence.

*Mr. Leonard J. Mather* for the appellant.

*Mr. George E. Hamilton, Mr. John W. Yerkes, Mr. M. J. Colbert,* and *Mr. John J. Hamilton* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

It will sufficiently dispose of this appeal if we confine our inquiry to the fifth assignment of error. This raises the main issue here involved. Was the appellee negligent in the duty it owed to the deceased, or was the deceased guilty of such contributory negligence as will furnish a defense for the appellee and prevent a recovery? There can be no recovery in this case unless appellee was guilty of negligence towards the deceased. In the absence of such negligence, there can be no legal foundation for recovery. If it be true that appellee installed at this crossing ample means for protecting the public from injury, and afforded this protection to the deceased, there can be no recovery. This is a question of fact, when there is a conflict of evidence, and one that must be determined from an analysis of the evidence.

This court, in *Glaria* v. *Washington Southern R. Co.* 30 App. D. C. 559, announced the following rule: " A motion to direct a verdict is an admission of every fact in evidence, and of every inference reasonably deducible therefrom. And the motion can be granted only when but one reasonable view can be taken of the evidence and the conclusions therefrom, and that view is utterly opposed to the plaintiff's right to recover in the case. Whenever there is uncertainty as regards the existence of negligence on the one hand, and of contributory negligence on the other, the issue must be submitted to the determination of the jury." If the evidence raises any issue whatever as to the existence of either negligence or contributory negligence, the question becomes one of fact, and not one of law, and should be submitted to the jury. The issue may arise from a conflict in the evidence, or from a state of facts from which reasonable, fairminded men might draw different conclusions. It must be re-

membered, however, that; even conceding that Welker was guilty of contributory negligence in this case, his negligence cannot be attributed to the deceased. Considering whether or not the deceased was guilty of contributory negligence, we find a boy twelve years of age, on the wagon of his employer, crossing the tracks of appellee at a point which the public had used for many years. It is therefore clear that he was not a trespasser on the right of way of the appellee. While we think he was not of such tender years as to render him incapable of being guilty of contributory negligence, he could not be deemed to possess the same degree of care and discretion as a person of mature years.

The trial court seemed to lay stress upon the fact that there was no proof that the deceased had ever before crossed the tracks at the point in question, or knew of the existence of the bell. The evidence discloses that the boy had lived with his parents for nine years at a point about 400 yards from the crossing. It might be presumed that he had frequently crossed the tracks during that time, and that he must have known of the existence of the bell, which, according to the evidence, had been installed there several years before. But such knowledge is immaterial; and it is therefore unnecessary to indulge in any presumptions on that point. The bell was placed at the crossing by the appellee company out of a duty it owed to the public. That duty arose from the necessity of the company establishing at that point some device that would serve to notify the traveling public of the approach of trains. It was the duty of the railroad company to give timely notice of the approach of trains at this crossing. That notice might consist of the ringing of an electric bell or other device, such as gates, or a flagman, or by sounding a whistle that could be distinctly heard sufficient time before reaching the crossing to serve as a warning to prevent persons or vehicles from entering upon the tracks. No particular device is prescribed by law. The company had the right of selection. In this instance an electric bell had been installed. It was the duty of the company to keep the bell in order. The company, having put the bell at the crossing in question, did so out of a duty it owed to the whole public. Whether the de-

ceased had ever crossed the tracks at this point, or knew of the existence of the bell, is immaterial. Appellee owed him the same protection it owed to the person who had crossed many times. He was entitled to the same notice that appellee had provided for the public; and, unless on the morning of the accident, some other notice was given of the approach of the train, that furnished equivalent protection to the deceased, the failure of the appellee to have the bell in such order as to give the usual alarm would constitute negligence.

The record before us discloses evidence to the effect that the bell did not ring when the train approached that caused the accident. It is not for this court or the court below to pass upon the sufficiency of the evidence to establish this fact. For the purposes of this inquiry, we must assume that the bell did not ring. With this condition confronting us, does the record disclose conclusively that appellee gave the deceased such warning as afforded reasonable and timely notice of the approach of the train?

It is insisted by counsel for appellee that due notice of the approach of the train was given by blowing the engine whistle. From the evidence of Timberlake and Strider, appellee's witnesses, the whistle did not blow until the train was within 150 yards of the crossing. A train traveling at the rate of 60 miles an hour would cover this space in less than six seconds. It will hardly be insisted that this would furnish ample notice to a person crossing a series of four railroad tracks with a loaded vehicle. The statement refutes itself. Appellee, in installing the bill, must have considered that at least one minute's notice was necessary, as it was arranged so that the approaching train would start the alarm when the train was 1 mile from the crossing. Besides, from the evidence of the witnesses for appellee, it is not clear that the whistle was blown as a warning of the approach of the train in question to the crossing, but to receive a signal from the agent at the station. We think that, on this branch of the case, there was an issue of fact that should have been submitted to the jury. In *Continental Improv. Co.* v. *Stead,* 95 U. S.

161, 164, 24 L. ed. 403, 405. Mr. Justice Bradley, delivering the opinion of the court, said: "But what is reasonable and timely warning may depend on many circumstances. It cannot be·such if the speed of the train be so great as to render it unavailing. The explosion of a cannon may be said to be a warning of the coming shot; but the velocity of the latter generally outstrips the warning. The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an·unslackened speed is desirable, watchmen should be stationed at the crossing."

It is also contended that it was the duty of the deceased to look along the track for approaching trains. Welker testifies that he stopped his horse and looked before starting across, and that no train was in sight. Again there is a conflict in the evidence as to the distance a train coming from towards Baltimore can be seen at the point where Welker approached the track. Some of the witnesses place the distance at ½ mile, and others at less than ¼ of a mile. In either event, the few seconds it took this train to cover the distance would afford a short warning. The deceased was a boy twelve years old. The inference may be fairly drawn that, if he looked along the track at the time Welker testifies he stopped his horse, that the train, though not in view, could have had time to reach the crossing before the vehicle, which was moving slowly, reached the third track, on which the train was running. These facts, the speed of the train, the distance it would move in a second of time, the exact distance it was from the crossing when it first gave warning of its approach, the kind of warning actually given, the opportunity of the deceased to see the train and hear the whistle, together with the age of the deceased, his capacity or incapacity to appreciate the danger of the situation, his experience and mental capacity due to his youth, are all questions for the jury to consider in determin-

ing whether or not he was guilty of contributory negligence. It is scarcely necessary to intimate that such questions are proper for the determination and decision of the jury, and not for the trial judge.

We are of the opinion that, in any view of this case, there was ample testimony to warrant the submission of the case to the jury. It was error for the trial court not to so submit it with proper instructions. The judgment is reversed with costs, and the cause is remanded with directions to grant a new trial.                                    *Reversed.*